**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**McALLEN DIVISION**

AMALIA RAMIREZ CASTELANO, ARTURO GARCIA, SOFIA ELIZABETH LOPEZ, MIRIAM SUJEE GONZALEZ, JUAN LUIS FLORES, ROCIO FLORES, J.S., a minor by and through his next friend Sonia Raquel Cantu-Sanchez, DAVID HERNANDEZ, and JUAN ARANDA, on their own behalf, and on behalf of all others similarly situated,

PLAINTIFFS-PETITIONERS,

v.

CONDOLEEZZA RICE, Secretary of State, PATRICK F. KENNEDY, Under Secretary for Management, MAURA HARTY, Assistant Secretary of State for Consular Affairs, ANN BARRETT, Managing Director, Passport Services Directorate, and UNITED STATES OF AMERICA,

DEFENDANTS-RESPONDENTS.

CA M-08-057

**SECOND AMENDED CLASS ACTION COMPLAINT AND PETITION FOR DECLARATORY, INJUNCTIVE, AND MANDAMUS RELIEF**

By this Second Amended Class Action Complaint and Petition for Declaratory, Injunctive, and Mandamus Relief, Plaintiffs-Petitioners Amalia Ramirez Castelano, Arturo Garcia, Sofia Elizabeth Lopez, Miriam Sujee Gonzalez, Juan Luis Flores, Rocio Flores, J.S. a minor through his next friend Sonia Raquel Cantu-Sanchez, David Hernandez, and Juan Aranda (collectively, "Plaintiffs"), on behalf of themselves and all others similarly situated, allege the following against Defendants Condoleezza Rice, Patrick F. Kennedy, Maura Harty, Ann Barrett, and the United States of America (collectively, "Defendants"):

EXHIBIT
tabbies
1

1. This is a case about the federal government denying a class of persons their fundamental rights to due process and equal protection, and their right not to be subject to arbitrary and capricious government action, in violation of the United States Constitution and federal law.

2. Plaintiffs are U.S. citizens who properly submitted fee-paid, substantiated applications for U.S. passports to the United States Department of State (hereafter "Department of State" or "Department").

3. For many citizens, applying for a passport is a routine affair that results in the Department processing an application and issuing a passport in a matter of weeks. Defendants, however, have not treated Plaintiffs and members of the proposed class like other citizens.

4. Plaintiffs and those they seek to represent are, or are perceived by the government to be, of Mexican descent. When they or their parents were born in states bordering Mexico (i.e., Texas, New Mexico, Arizona and California (hereafter "Southwestern border states")), their births were attended by midwives or other nonphysicians (hereafter "midwives") in a home or local clinic. On the basis of these common and innocent facts – Mexican descent and a midwife-assisted birth in a Southwestern border state – Defendants have demanded that these passport applicants furnish a litany of additional documents to substantiate their citizenship and qualification for a passport, and have then arbitrarily deemed their applications abandoned, classifying them as "filed without action," even after substantial evidence of the applicants' U.S. citizenship has been provided. In this way, the Department effectively denies the passport applications and leaves Plaintiffs and proposed class members with no recourse other than to file a lawsuit or reapply, pay yet another fee, and face the same treatment again.

5. The Department's policy, pattern, and practice of subjecting passport applications by persons of Mexican descent whose births were attended by midwives to heightened scrutiny and burdensome and excessive demands, and then channeling their applications into a regulatory black hole, is unconstitutional. It deprives Plaintiffs of their right to due process of law, discriminates on the basis of race, ancestry, and ethnicity, and is arbitrary and capricious.

6. Indeed, rather than making individualized decisions about Plaintiffs' passport applications, Defendants have adopted a policy that casts unwarranted suspicion on the basis of Mexican descent and midwife-assisted birth in a Southwestern border state.

7. The Department first imposes unreasonable, burdensome, and excessive evidentiary demands on such applicants. Specifically, the Department demands that these passport applicants prove birth in the United States by producing a host of documents that go far beyond what other applicants must ordinarily produce. As a matter of course, the Department seeks from Plaintiffs and proposed class members documents that likely never existed, that applicants would plainly not possess in the first instance if they ever did exist, or that ordinary people would rarely possess decades after the documents were originally issued.

8. Further, even after Plaintiffs expend substantial effort and cost in an effort to comply with the Department's impermissibly heightened standards – and produce evidence that goes well beyond what is demanded of other persons who apply for and receive passports – Defendants still refuse to adjudicate Plaintiffs' passport applications individually and on the merits. Instead, the Department arbitrarily and unreasonably deems Plaintiffs' applications abandoned, classifying them as "filed without further action" or otherwise closed.

9. When the Department of State classifies an application as "filed without further action," it effectively denies the application, but it does so without affording the applicant the same process as when it issues a formal denial. By all appearances, the Department has instituted and maintained a discriminatory policy, pattern, and practice of deeming applications "filed without further action" or otherwise closing applications of those they regard with categorical suspicion. Through this policy, pattern, and practice the Department deflects and quietly but effectively denies applications as to which there is neither a sufficient individualized basis nor supervisory approval for a formal denial. The Department's maintenance and application of this process to Plaintiffs and proposed class members, which ultimately results in their being unable to obtain passports, violates such persons' rights to due process and equal protection, and is arbitrary and capricious and otherwise contrary to law.

10. Without passports, Plaintiffs and those who are similarly situated are denied a vital resource and right that they – like all other U.S. citizens – require to travel, work, access affordable medical care, and maintain business interests and contact with family members outside the United States. In fact, once new passport requirements are fully implemented in June 2009, Plaintiffs and those who are similarly situated will face the impossible situation of not knowing if they will be able to return home if they leave the United States.

11. The Department is likely to claim that it needs to impose heightened passport requirements because several midwives working in Southwestern border states were convicted of fraudulently registering births in the region. But those relatively isolated incidents do not give Defendants a basis to violate the due process and equal protection rights of midwife-delivered Mexican-American passport applicants from Southwestern border states. Indeed, rather than

conducting individual inquiries, Defendants have stripped Plaintiffs and those who are similarly situated of the rights and benefits of U.S. citizenship to which they are entitled and have effectively reduced to second-class citizenship status an entire swath of passport applicants based solely on their being of Mexican or Latino descent and having been delivered by midwives in nonhospital settings in Southwestern border states.

12. Plaintiffs allege that by their discriminatory policy, pattern, and practice, Defendants named herein deprive them and many hundreds of similarly situated U.S. passport applicants of the due process and equal protection rights guaranteed to each of them under the Fifth Amendment to the Constitution of the United States, as well as their rights under the Administrative Procedure Act. On behalf of themselves and those who are similarly situated, Plaintiffs thus seek declaratory, injunctive, and mandamus relief from Defendants' policy, pattern, and practice of subjecting passport applicants who are Mexican-American or have Latino surnames to differential treatment based on a categorical suspicion; imposing on them arbitrary, unreasonable, burdensome, and excessive requests for additional evidence; and then arbitrarily closing or filing the passport applications "without further action," without fair notice to the applicants or an individualized adjudication on the merits.

## I. JURISDICTION AND VENUE

13. Jurisdiction lies under 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 1346(a)(2) (actions against officers of the United States), 28 U.S.C. § 1361 (Writ of Mandamus), 28 U.S.C. §§ 2201-2202 (Declaratory Judgment Act), 8 U.S.C. § 1503 (denial of rights and privileges as a U.S. Citizen), and 5 U.S.C. §§ 701-702 (Administrative Procedure Act).

14. Venue is proper under 28 U.S.C. § 1391(e). Plaintiffs reside within the jurisdiction of this Court and submitted their applications for U.S. passports at designated locations, including but not limited to the U.S. Post Offices in McAllen and Harlingen, Texas, in the Southern District of Texas, within this Court's jurisdiction.

## II. THE PARTIES

15. Plaintiff-Petitioner Amalia Ramirez Castelano is of Mexican descent and was born in Weslaco, Texas, in 1968.* She currently resides in Mission, Texas. Ms. Castelano applied for a U.S. passport in May 2007. She subsequently received a letter, dated December 17, 2007, from the Department of State through its National Passport Center in New Hampshire, informing her that her passport application was being filed without action.

16. Plaintiff-Petitioner Arturo Garcia is of Mexican descent and was born in 1932 in San Benito, Texas. He currently lives in Alton, Texas. Mr. Garcia applied for a U.S. passport in or about 2006. He subsequently received a letter dated February 6, 2007, from the Department of State, informing him that his passport application was being filed without further action.

17. Plaintiff-Petitioner Sofia Elizabeth Lopez is of Mexican descent and was born in 1989 in Brownsville, Texas, where she currently resides. She applied for a U.S. passport in 2007. She subsequently received a letter, dated February 21, 2008, from the Department of State through its Houston Passport Agency, informing her that her passport application was being filed without further action.

18. Plaintiff-Petitioner Miriam Sujee Gonzalez is of Mexican descent and was born in 1976 in Brownsville, Texas. She also currently resides in Houston, Texas. Ms. Gonzalez

* In accordance with General Order 2004-11 and Federal Rule of Civil Procedure 5.2, specific dates of birth are not listed herein. Exhibits referenced herein and containing personal identifying information have been filed with the Court in two formats: (1) in redacted form, and (2) under seal without redactions.

applied for a U.S. passport in 2007. She subsequently received a letter, dated February 2, 2008, from the Department of State through its Houston Passport Agency, informing her that her passport application was being filed without further action.

19. Plaintiff-Petitioner Juan Luis Flores is of Mexican descent and was born in 1954 in Rio Hondo, Texas. He currently resides in Los Fresnos, Texas. Mr. Flores applied for a U.S. passport in November 2007. He subsequently received a letter, dated March 26, 2008, from the Department of State through its Charleston Passport Center, informing him that his passport application was being filed without further action.

20. Plaintiff-Petitioner Rocio Flores is of Mexican descent and was born in 1978 in Matamoros, Mexico. She currently resides in Los Fresnos, Texas. She acquired U.S. citizenship through her father, Plaintiff Juan Luis Flores. Ms. Flores applied for a U.S. passport in November 2007. She subsequently received a letter, dated March 26, 2008, from the Department of State through its Charleston Passport Center, informing her that her passport application was being filed without further action.

21. Plaintiff-Petitioner J.S., a minor, is of Mexican descent and was born in 1994 in San Juan, Texas. He currently resides in Mission, Texas. Sonia Raquel Cantu-Sanchez is his mother and "next friend." J.S., through his mother, applied for a U.S. passport on January 3, 2008. He subsequently received a letter, dated April 24, 2008, from the Department of State through its Houston Passport Agency, informing him that his passport application was being filed without further action.

22. Plaintiff-Petitioner David Hernandez is of Mexican descent and was born in 1964 in San Benito, Texas. He currently resides in Harlingen, Texas. Mr. Hernandez applied for a

U.S. passport in 2007. He subsequently received a letter, dated April 8, 2008, from the Department of State through its National Passport Center in New Hampshire, informing him that his passport application was being filed without further action.

23. Plaintiff-Petitioner Juan Aranda is of Mexican descent and was born in 1970 in Weslaco, Texas, where he currently resides. Mr. Aranda applied for a U.S. passport on May 23, 2007. After receiving neither a passport nor written correspondence about the status of his application, he called the Department's toll-free number and was then informed that his case had been closed. Mr. Aranda reapplied for a passport on November 18, 2007. He received a letter, dated February 1, 2008, from the Department of State through its National Passport Center in New Hampshire, informing him that his passport application was being filed without further action.

24. Defendant-Respondent Condoleezza Rice is the duly appointed Secretary of State of the United States. She is the head of the Department of State and is responsible for setting and overseeing implementation of the policies and procedures employed by the Department of State and all its various subdivisions, including the Bureau of Consular Affairs and Passport Services Directorate. Secretary Rice is sued here in her official capacity.

25. Defendant-Respondent Patrick F. Kennedy is the Department of State's Under Secretary for Management. Under Secretary Kennedy leads a number of bureaus within the Department of State, including the Bureau of Consular Affairs, and is responsible for setting and overseeing implementation of the policies and procedures employed by the bureaus under his leadership. Under Secretary Kennedy is sued here in his official capacity.

26. Defendant-Respondent Maura Harty is the Assistant Secretary of State for Consular Affairs. The Bureau of Consular Affairs is responsible for providing the passports that enable U.S. citizens to travel internationally. Assistant Secretary Harty is responsible for setting and overseeing implementation of the policies and procedures employed by the Bureau of Consular Affairs. Assistant Secretary Harty is sued here in her official capacity.

27. Defendant-Respondent Ann Barrett is the Managing Director of the Passport Services Directorate, within the Bureau of Consular Affairs. The Passport Services Directorate adjudicates passport applications and issues passports to U.S. citizens. Passport Services includes 13 Regional Passport Agencies, one Gateway City Passport Agency, one Special Issuance Agency, three National Processing Facilities, the National Passport Information Center, a network of more than nine thousand public government offices across the United States designated by Passport Services to accept applications, and Headquarters offices in Washington, D.C. Director Barrett is responsible for setting and overseeing implementation of the policies and procedures employed by the Passport Services Directorate. Director Barrett is sued here in her official capacity.

28. The United States of America is also a named Defendant-Respondent.

29. As referred to herein, the "Department" or "the Department of State" includes all Defendants-Respondents named herein.

## III. THE FACTS

### A. The Need of Plaintiffs and Similarly Situated U.S. Citizens for a Passport

30. Plaintiffs are part of an ever-growing group of U.S. citizens seeking passports, many for the first time. Over the years, they have been able to travel freely as citizens across the

nation's land borders. Most recently, they have been able to do so using their birth certificates along with a government-issued photo identification document such as a driver's license. By virtue of the Western Hemisphere Travel Initiative ("WHTI"), an outgrowth of the Intelligence Reform and Terrorism Prevention Act of 2004, they now need a passport, passport card or other WHTI-compliant document that denotes identity and citizenship when entering the United States by air. By June 1, 2009, the date the U.S. government has set for implementation of the full requirements of the land and sea phase of WHTI, most U.S. citizens – Plaintiffs included – will be required to have a passport or passport card in order to enter the United States through a sea or land port of entry.

31. For many U.S. citizens, including Plaintiffs, it is imperative that a passport be secured by the time WHTI is fully implemented. For those who live near the external boundary of the United States, the need for a passport is particularly urgent, as so many must regularly cross the border for work, to access affordable medical care, to tend to business interests, and to visit family members and friends who live on the other side of the border.

32. Driven by an interest in and, in many cases, the need to travel outside the United States, Plaintiffs and countless other U.S. citizens have applied for U.S. passports from the Passport Services Directorate of the Department of State's Bureau of Consular Affairs.

33. Routine application and execution fees, which are nonrefundable, currently total $100 for passport applicants ages 16 and over and $85 for those under age 16. The Department represents that three weeks is the approximate processing time for routine passport applications. *See* http://travel.state.gov/passport/get/processing/processing_1740.html (last visited September 4, 2008).

34. Persons born in the United States and applying for a passport for the first time generally must submit a birth certificate in support of their application for a passport. A birth certificate showing the applicant's full name, place and date of birth, and parents' full names; signed by the official custodian of birth records; bearing the seal of the issuing office; and showing a filing date within one year of the date of birth is "primary evidence" of birth in the United States. *See* 72 Fed. Reg. 64930, 64936 (Nov. 19, 2007) (codified at 8 C.F.R. § 51.42 (effective Feb. 1, 2008)); *see also* http://travel.state.gov/passport/get/first/first_830.html (last visited September 4, 2008).

35. Persons born in the United States who are unable to submit such a birth certificate must submit "secondary evidence" sufficient to establish birth in the United States by a preponderance of the evidence. Secondary evidence includes but is not limited to baptismal certificates, medical and school records, certificates of circumcision, hospital birth certificates, other documentary evidence, and affidavits of persons having personal knowledge of the facts of the applicant's birth. *See* 72 Fed. Reg. at 64936 (codified at 8 C.F.R. § 51.42 (effective Feb. 1, 2008)); *see also* 22 C.F.R. § 51.43 (2007).

36. The Department may require an applicant to provide additional evidence needed to establish that the applicant is a U.S. citizen or noncitizen national. *See* 72 Fed. Reg. at 64936 (codified at 22 C.F.R. § 51.45 (effective Feb. 1, 2008)); *see also* 22 C.F.R. § 51.54 (2007). Its regulations, however, do not purport to attempt to alter the "preponderance of the evidence" standard that courts have uniformly long held to be the standard by which one must establish U.S. citizenship to claim the rights and privileges thereof.

**B. Defendants' Categorical Suspicion of Mexican-Americans Delivered by Midwives**

37. Despite having submitted valid birth certificates and, in most cases, additional evidence of having been born in the United States (or otherwise having derived U.S. citizenship), Plaintiffs and proposed class members have endured lengthy delays – far longer than the typical three-week processing time – in the handling of their passport applications. On information and belief, this is because Plaintiffs and proposed class members are or are perceived to be of Mexican descent and were born with the assistance of midwives in Southwestern border states.

38. Indeed, while their births span decades, a fact common to Plaintiffs and members of the proposed class is that their births (or the birth of a parent through whom citizenship has been derived) were attended by midwives, at home or in a local clinic or other nonhospital setting.

39. Midwife-assisted births have been common in certain parts of the United States, including Texas and other parts of the Southwest, particularly in underserved communities with limited access to hospitals and private physicians.

40. In fact, midwifery has a history in Texas that predates the State's formal existence. As the Texas Department of State Health Services ("Texas Health Services Department") has noted, "*Parteras* serving the Spanish speaking population and 'granny ladies' in rural Texas are part of the traditional folklore and cultural legacy of Texas history." Texas Midwifery Board, *About the Profession - History in Texas*, available at http://www.dshs.state.tx.us/midwife/mw_history.shtm (last visited September 4, 2008). In 1925, for example, more than half the babies born in Texas were delivered by midwives. *See id.* For many women, a midwife-assisted birth at a home or local clinic has been the only option for a

range of reasons, including lack of a nearby hospital, lack of health insurance, and language and cultural barriers. Indeed, the Texas Health Services Department has itself associated the prevalence of midwife-assisted births in the state with the "rural and working poor population in Texas, among whom low income served as a barrier to institutional medical care." *Id.* For all these reasons, midwife delivery has for many decades been preferred and common among mothers residing in Southwestern border states, and in Texas particularly. Even today, a significant number of births in this region are with the assistance of a midwife. For example, in 2004, thousands of births in Texas were assisted by midwives. *See* Texas Department of State Health Services Center for Health Statistics, *Migration for Birth: A Birth-Origin Study of Texas Newborns January-December 2004*, at 3-318 (2008), *available at* http://www.dshs.state.tx.us/chs/pubs/migr/MFB2004.pdf (last visited September 4, 2008).

41. Despite the sizeable number of midwife-assisted births and the important reasons why so many women have relied on midwives over the years, with WHTI having prompted a wave of new passport applications, Defendants appear to have adopted and applied blanket suspicion toward one particular group of passport applicants – those who are or are perceived to be of Mexican descent and whose deliveries in Southwestern border states were assisted by midwives. These include Plaintiffs and members of the proposed class.

42. Over the course of this long history of midwifery, a relatively small number of midwives concentrated in Southwestern border states, and in Texas in particular, registered births as having taken place in the United States when in fact they did not. Specifically, since 1960, the government has reportedly secured convictions for approximately 75 midwives in the South Texas region for fraudulently registering births in the United States. Most of these convictions

came in and after the 1980s; approximately 12 preceded that period, and none is known to have preceded the 1960s.

43. At some point in time, the former Immigration and Naturalization Service ("INS") (functions of which were absorbed by the Department of Homeland Security when the latter was created and the former dissolved) developed and began using a list of "suspicious" midwives. A copy of a document believed to be the "suspicious midwives list," which does not include convictions past 1996, is attached hereto as Exhibit A. Though no more than 60 midwives were convicted to that point, the list identifies nearly 250 midwives as having been labeled "suspicious." Little is known to the public as to how the INS came to label nearly 200, if not more, unconvicted midwives as "suspicious."

44. The fact remains that the overwhelming majority of midwife-delivered babies registered as having been born in the United States, even in the areas where these "suspicious" midwives practiced, were born in the United States. Indeed, even midwives who were convicted for having fraudulently registered births are also known to have actually assisted in the births of babies who were delivered in the United States and were legitimately registered as such. For example, in at least one instance, an applicant who was delivered by a convicted midwife established to the satisfaction of a federal district court that her birth took place in the United States. In fact, an applicant alleged to have been specifically identified as having been fraudulently registered nonetheless has proven her birth in the United States and been issued a passport.

45. Moreover, to the extent that the government has had suspicions about midwife-related fraud dating back decades, it did not give affected persons any notice or opportunity to

counter the allegation of fraud in their individual cases. For many, evidence supporting the fact of their births in the United States that once existed is now unavailable due to the passage of so much time. In this way, the Department itself has put at risk the legitimate claims to U.S. citizenship of countless proposed class members.

46. On information and belief, the Department of State relies on the "suspicious midwives list," and even goes beyond that list, and treats Mexican-American and certain other Latino passport applicants delivered by midwives – even those not on the "suspicious midwives list," let alone convicted – with blanket suspicion. The Department applies this blanket suspicion even to births that precede 1960, despite the fact that there is no reported evidence of midwife-related fraud prior to that period.

**C. Defendants' Arbitrary, Unreasonable, and Burdensome Demands for Unnecessary Supplemental Documentation**

47. In casting a categorical net of suspicion this broadly and in engaging in, sanctioning, and allowing the above-noted practices by the Department, Defendants are effectively denying the passports of many for the alleged sins of a few, without individualized suspicion and without a fair or meaningful process for Plaintiffs and proposed class members to demonstrate their citizenship and to enjoy the same rights and privileges as their fellow citizens.

48. Rather than receiving prompt adjudication of their passport applications, Plaintiffs and members of the proposed class have instead encountered a bureaucracy that has subjected them to arbitrary, unreasonable, excessive, and burdensome demands for further documentation and evidence of their U.S. citizenship.

49. Plaintiffs and members of the proposed class submitted the same documentary evidence with their passport applications that, in countless other cases, has sufficed for the Department to adjudicate the application and provide a passport.

50. In response to Plaintiffs and members of the proposed class, however, instead of adjudicating their passport applications as filed (with the same evidence deemed sufficient for the issuance of a passport in other cases), the Department, through written and, in many cases, telephonic communications, has demanded supplemental evidence of citizenship.

51. In virtually none of these cases did the Department provide a meaningful explanation as to what it perceived to be deficient in the submission that preceded the demand for further evidence. Letters from the Department's Passport Centers typically assert only that "we have determined that further information is needed to support your claim of birth in the U.S." or the evidence submitted "does not sufficiently support your date and place of birth in the United States."

52. The Department goes on either to direct the applicant to submit particular documents or to instruct that it is necessary that the applicant submit a combination of original documents created prior to or at the time of the applicant's birth, followed by a list of examples that include documents that, if they existed at all, would be burdensome and often costly to obtain. Affidavits from persons with direct knowledge of the circumstances of the applicant's birth are not identified as an option in these letters.

53. In some cases, the government seeks documents that never existed, that people would plainly not possess in the first instance, or that people would certainly not possess decades after the documents were originally issued. For example, an applicant born in 1934 and his

Mexican-born daughter, who acquired citizenship through him, simultaneously applied for U.S. passports. Her application was granted. The father, however, was sent the standard letter requesting additional documentation. After he sent a wealth of evidence, including a copy of his daughter's U.S. passport, which, he explained, had been issued on the basis of his U.S. citizenship, the Department instructed that he provide a 1935 census report. He responded that there was no census in 1935. The Department then directed that he produce additional documents, including records of prenatal care that (if received by his mother) would have dated back nearly 75 years.

54. In many instances, the only plausible means by which an applicant could secure the documents sought – for example, border crossing cards that parents used in the 1960s and later remitted to the government – would be through a request to the government itself under the Freedom of Information Act, assuming the government has itself maintained complete files and not discarded such documents over the years. Yet the Department provides no information as to how applicants can secure original documents that may be in the government's possession and control. And applicants who have gone to federal immigration offices seeking to locate documents that would evidence their parents' presence in the United States when they were born have been told such old documents were not maintained or were otherwise not accessible.

55. The Department has also insisted that applicants produce documentary evidence that will almost invariably not exist for the children of parents who did not continuously reside in the United States but who were among many for whom going back and forth across the border was common and routine. The Department in this manner has made it virtually impossible for such applicants to obtain passports, even though the absence of the supplemental evidence

demanded by the government in these cases makes it no more or less likely that these applicants were born in the United States.

56. In addition to demanding a host of documents that might not even exist or be accessible, or that could take inordinate time and resources to attempt to locate even if they were to exist, the Department's demand generally also includes the threat that failure to respond "adequately" within a relatively tight time frame – often 30 or 45 days – will result in the denial of the application.

57. In many cases, the Department's demand is issued to a passport applicant whose citizenship has previously been recognized and relied upon in proceedings through which the applicant's family member(s) secured immigration benefits or a certificate of citizenship.

58. In some cases, demands for additional evidence are issued to applicants who previously held a U.S. passport.

59. In other cases, the Department's demand is for essentially the same documents that the applicant has already provided in support of his or her application. Indeed, some applicants whose cases were filed without further action but who paid a new fee and submitted the same evidence received U.S. passports on their second try.

60. Applicants who attempt to correspond with the Department to address the problems they are experiencing find themselves unable to make contact with any Department employee who can or will give accurate answers to questions about their applications.

61. In some cases, the Department provides confusing information to potential applicants about the kinds of documents required in the first instance to apply for a passport. The Passport Office in Brownsville, Texas, for example, has instructed passport applicants to

present with their applications a Long Form Certified Birth Certificate or a U.S. Naturalization Form, and has reportedly refused to accept applications in the absence thereof. However, not every U.S. citizen possesses one of these two forms. Moreover, citizenship and eligibility for a passport may be demonstrated with evidence that does *not* include either form. Yet this information is not revealed on the sheet of directions that the Brownsville Passport Office makes most accessible to prospective applicants, and, as a result, a number of U.S. citizens attempting to apply for passports have been turned away.

62. Except in limited circumstances not applicable here, a passport applicant is entitled to receive a passport upon demonstrating by a preponderance of evidence that she or he is a U.S. citizen or national. For Plaintiffs and members of the proposed class, however, Defendants, in an arbitrary, capricious, impermissible, and discriminatory manner, have effectively imposed a substantially higher burden of proof by demanding and insisting upon excessive production of difficult-if-not-impossible-to-obtain documents after the applicants have already provided evidence sufficient to meet the applicable evidentiary standard, and in any event have provided evidence sufficient to warrant an individualized adjudication on the merits of the application.

63. On information and belief, Defendants have failed to provide adjudicators with adequate training, guidance, and supervision required to avoid discriminatory and arbitrary and capricious decisions in regard to what type and amount of evidence should and will be accepted as sufficient to meet the preponderance of the evidence standard.

**D. Defendants' Policy, Pattern, and Practice of Classifying Passport Applications as "Filed Without Further Action"**

64. Rather than adjudicate the applications of Plaintiffs and members of the proposed class on the merits, the Department has adopted and employed a policy, pattern, and practice of simply closing their applications even *after* the applicants have responded to the Department's demands for additional evidence. Defendants in this manner have abdicated their adjudicatory responsibilities and their duty to issue passports to otherwise eligible applicants who have sufficiently demonstrated that they are U.S. citizens or nationals.

65. Plaintiffs and proposed class members have submitted documentation and evidence that should have been sufficient for a passport to issue and, in any event, for a meaningful individualized decision on the merits of their applications.

66. Instead, Plaintiffs and proposed class members thereafter each received from the Department virtually identical letters stating:

> Our office wrote to you on [date], and requested further information and/or documentation in support of your passport application. We have not received a response from you, **or** you have not fully complied, with the request for additional information and/or documentation in the referenced correspondence. Therefore, your passport application is being filed without further action.

*See*, *e.g.*, Exhibits B at 1, C at 1, D at 1, E at 1, F at 21.

67. With new regulations that became effective February 1, 2008, the Department gave itself unbounded authority to treat applications as having been "abandoned." *See* 72 Fed. Reg. 64930, 64938-39 (Nov. 19, 2007) (codified at 22 C.F.R. § 51.65). In reality, even before its new regulation went into effect, the Department began its pattern and practice of issuing "filed without further action" letters, deeming abandoned and effectively denying applications from

persons such as Plaintiffs who had submitted evidence sufficient to warrant issuance of a passport or, in any event, a meaningful adjudication on the merits rather than having the Department treat their applications as having been abandoned.

68. Notably, the Department published a proposed rule in March 2007 that did not grant itself the authority to deem applications abandoned in this manner. Under the proposed rule, "[a]n applicant for a passport w[ould] be denied if an applicant fail[ed] to meet his or her burden of proof . . . or otherwise d[id] not provide documentation sufficient to establish entitlement to passport issuance within ninety days of notification by the Department that additional information from the applicant is required." 72 Fed. Reg. 10095, 10104 (Mar. 7, 2007). When the Department published its final rule in November 2007, however, it provided that "[a]n application for a passport will be denied *or treated as abandoned* if an applicant fails to meet his or her burden of proof . . . ." 72 Fed. Reg. at 64938-64939 (codified at 22 C.F.R. § 51.65(b)) (emphasis added).

69. In a separate subsection of its new regulations, the Department further provided that it would "notify in writing any person whose application for issuance of a passport has been denied . . . set[ting] forth the specific reasons for the denial . . . ." *Id.* at 64938 (codified at 22 C.F.R. § 51.65(a)). (The regulations being replaced similarly provided that applicants denied passports would be given notice of the specified reasons for the adverse action. *See* 22 C.F.R. § 51.75 (2007).) When it added for itself authority to treat applications as abandoned – even on the basis of an unspecified burden of proof having not been met – however, the Department did not provide that it would give applicants notice of the specific reasons why their applications were treated as abandoned.

70. Because the prospect of such broad authority to treat applications as abandoned (and to not give specific reasons for doing so) was not a possible outcome of the rule change as published, the public had neither notice nor an opportunity to comment on the wisdom or propriety of the rule that the Department promulgated.

71. Having one's passport application deemed "filed without further action" is functionally the same as having one's application denied, but it is an outcome that the Department effects without affording the same process to the applicant as when an application is formally denied.

72. On information and belief, the Department widely employs the technique of deeming applications "filed without further action" or otherwise closed rather than denying passport applications in part because the procedures for explicitly and formally "denying" a passport application are more complicated and require a number of supervisory approvals, while an application can be "filed without further action" or otherwise deemed abandoned or closed without the review and other procedural protections that would have to precede a formal "denial."

73. On information and belief, by the technique of deeming applications "filed without further action" or otherwise closed, the Department enables its adjudicators to deflect and effectively reject applications that may present complications in the mind of the adjudicators but as to which there is an insufficient basis for a denial of the application.

74. On information and belief, Defendants have been employing the technique of "filing without further action" or otherwise closing the applications of Plaintiffs and proposed class members as a *sub silentio* means of denying passports on the basis of Defendants'

categorical suspicion of applicants who are Mexican-American or have Latino surnames whose births were attended by midwives in Southwestern border states.

75. Passport adjudicators under the direction and control of Defendants routinely "file[] without further action" or otherwise close applications submitted by Plaintiffs and proposed class members when there is no reasonable basis to conclude that the application has been abandoned.

76. In countless cases, "filed without further action" letters are issued to proposed class members after they have submitted responsive supplemental documentation.

77. It is also common that the Department issues "filed without further action" letters or otherwise closes applications before it has given applicants sufficient time to gather documents that have been demanded but that can be difficult and time-consuming to secure. In fact, a number of Plaintiffs received "filed without further action" letters from the Department well before the end of the 90-day period that the Department's own regulation requires it to provide applicants to respond to demands for additional information. *See* 22 C.F.R. § 51.65(b) (2008) (stating that passport applications will be denied or treated as abandoned if an applicant does not provide "documentation sufficient to establish entitlement to passport issuance within ninety days of notification by the Department that additional information from the applicant is required").

78. In many cases, the "filed without further action" decision is issued to persons whose citizenship has previously been recognized in a formal proceeding before a federal agency and/or a court of law, and/or through whom family members have received immigration benefits or derived their own citizenship.

79. The issuance of "filed without further action" letters and closures of the applications in this manner leaves Plaintiffs and proposed class members in the untenable position of having to live without the passport each needs and be denied a right and privilege to which each is entitled, petition for a federal court to render a *de novo* determination of citizenship with the attendant cost that many cannot bear, or apply yet again for a passport with payment of another fee to the Department but with no indication that a new application will meet with a different response from Defendants.

80. Defendants' policy, pattern, and practice also has a chilling effect on applicants who receive Department demands for extensive additional evidence in support of their applications and have watched friends, neighbors and family members go to great lengths to produce such evidence in their own cases only to receive "filed without further action" letters that effectively deny them passports.

81. Applicants who have received the "filed without further action" letters have not been informed of any avenue for administratively appealing the Department's decision to close their applications and effectively deny them passports. On information and belief, there are, in fact, no further administrative remedies available to applicants who receive "filed without further action" letters.

82. The Department's "filed without further action" letters also fail to inform applicants that they may seek a *de novo* adjudication of their citizenship by petitioning a federal district court. The letters instead advise only that applicants may apply again in the future, although applicants' original documents are not always returned. The letters note that application fees paid for the application that has been filed without action will not be returned.

83. On information and belief, Defendants have not provided adjudicators with sufficient guidance, training, or supervision to ensure that there is consistency and foundation as to when an application may permissibly and reasonably be classified as "filed without further action" or otherwise closed or deemed abandoned. Defendants also failed to provide adjudicators sufficient guidance, training, or supervision to ensure that they make decisions in a nondiscriminatory fashion.

84. Defendants have thus engaged in the unconstitutional policy, pattern, and practice of subjecting applicants who are Mexican-Americans or have Latino surnames, and whose births in Southwestern border states were attended by midwives, to arbitrary, capricious, unreasonable, discriminatory, and burdensome demands for evidence that other applicants generally do not face. The Department has implemented this unconstitutional policy, pattern, or practice despite the absence of individualized suspicion against the applicants and has in the same manner ultimately classified their applications as "filed without further action." In other words, the Department has prevented Plaintiffs and proposed class members from obtaining passports without the benefit of individualized adjudication on the merits, and with only a bare nod to the applicants being able to start all over again with a new filing fee and no reason to expect a different outcome.

85. Plaintiffs and proposed class members are thus subjected to arbitrary, capricious, unreasonable, and burdensome demands for additional evidence, an impermissibly heightened burden of proof, a lack of adequate notice regarding perceived deficiencies in their applications, and effective denial by the "filing without further action" of their applications, even after they

have gone to extraordinary effort and expense to produce supplemental evidence of their births in the United States.

### E. Plaintiffs' Experiences in the Passport Application Process

86. The experiences of the Plaintiffs are a function of and typical of the systemic policies, patterns and practices described herein.

#### 1. AMALIA CASTELANO

87. Amalia Castelano (née Moralez) was born in Weslaco, Texas, in 1968. At the time of her birth, Ms. Castelano's parents were citizens of Mexico and resided in Reynosa, Mexico, but had local crossing cards. While pregnant with Amalia, Ms. Castelano's mother was visiting family members in Weslaco, Texas, when she unexpectedly went into labor.

88. Ms. Castelano's birth was attended by a midwife, Manuella Bazan, whose name does not appear on the "suspicious midwives list." *See* Exhibit A. Her birth was registered by Manuella Bazan in Hidalgo County, Texas, on the same day as her birth.

89. Ms. Castelano was baptized in Weslaco, Texas, approximately two months after her birth.

90. Shortly after Ms. Castelano was born, her parents returned to Mexico, taking her with them. Ms. Castelano resided with her family in Mexico from 1969 until 1990.

91. On April 12, 1972, Ms. Castelano's birth was registered in Reynosa, Mexico, in order to ensure that she would be able to access healthcare for various medical problems. She attended school in Reynosa up to the third year of secondary school.

92. In 1990, Ms. Castelano moved back to the United States. She has resided here continuously since then.

93. On January 31, 1990, Ms. Castelano married Gilberto Castelano in Hidalgo County, Texas. Mr. Castelano immigrated and ultimately was naturalized as a U.S. citizen through his wife's status as a U.S. citizen. Their three children were all born in the United States.

94. In May 2007, Ms. Castelano applied for a U.S. passport.

95. In a letter dated September 7, 2007, the passport agency directed that she provide additional evidence of her U.S. citizenship within 30 days. *See* Exhibit G at 4.

96. With the help of counsel, a response was prepared, with a variety of (original) documents, and sent to the National Passport Center on October 2, 2007, and delivered on October 4, 2007. *See id.* at 3, 5. This package of supporting documents included Ms. Castelano's baptismal certificate (noting her birth in Weslaco, Texas); her parents' Forma 13 (a Mexican document used to apply for a U.S. border crossing card) and border crossing cards; Mexican school certificates from 1980, 1981, and 1984; her marriage certificate; an affidavit from her parents explaining the circumstances of her birth; and a declaration from Federico Vaquera Moralez (the cousin of Ms. Castelano's father) as witness to her birth. The documents submitted are attached hereto as Exhibit G.

97. On or about October 23, 2007, Ms. Castelano received a phone call from the National Passport Center, requesting additional documentation of the manner in which her mother crossed into the United States, asserting that the documentation previously submitted did not establish this fact. The caller informed her that her application would be "closed" within 30 days if she did not provide such documentation.

98. Ms. Castelano consulted counsel, who prepared a letter, dated October 31, 2007, requesting that the application be granted or denied on the basis of the documentation provided, and that in the future, all communication be directed to counsel. Ms. Castelano co-signed this letter. *See id.* at 34.

99. In November 2007, Ms. Castelano received a message on her answering machine from the Passport Center requesting a copy of her Mexican birth certificate, the existence of which had been disclosed in the affidavit of her parents. On November 26, 2007, Ms. Castelano sent a copy of her Mexican birth certificate and a copy of the October 31, 2007 letter from her attorney to the Department, and again requested that the Office deal directly with counsel.

100. The only written communication Ms. Castelano received from the Department was its letter dated September 7, 2007. Ms. Castelano responded to this request on October 2, 2007, by sending supporting documentation. Her attempt to provide evidence is confirmed by the UPS tracking record and the telephone call from the National Passport Center advising Ms. Castelano that the documents submitted in the package delivered on October 4, 2007, were insufficient and did not adequately establish her mother's manner of crossing into the United States. The Department's receipt of the October 4, 2007 package is further confirmed by the message on Ms. Castelano's answering machine requesting her Mexican birth certificate (the existence of which was disclosed in the materials submitted on October 2, 2007, and received on October 4, 2007).

101. Its receipt of the requested evidence notwithstanding, the Department responded to Ms. Castelano's submission of the requested evidence by letter dated December 17, 2007, denying the very fact that she had already replied. *See* Exhibit G at 1. This letter informed her

that "[s]ince we have not received a response from you to our previous correspondence, your application is being filed without action." *Id.* It further stated that her citizenship documents would be returned to her within four to six weeks under separate cover. The letter did not suggest any avenue of appeal for Ms. Castelano. Instead, it stated that if she still wishes to obtain a passport, she will "need to reapply, submit proof of [her] United States citizenship and pay all fees." *Id.*

102. Ms. Castelano received another letter from the Department, dated March 7, 2008, stating: "Since we have not received a response from you to our previous correspondence, your passport application is being filed without further action. . . . If you still wish to obtain a passport book and/or passport card, you will need to reapply." *Id.* at 2. The March 7, 2008 letter enclosed documents previously submitted in support of Ms. Castelano's passport application.

103. The letter of December 17, 2007, in effect denied Ms. Castelano's application for a passport. On information and belief, Ms. Castelano asserts that the Department's "closure" of her passport application was the product and function of the policy, pattern, and practice alleged herein.

**2. ARTURO GARCIA**

104. Arturo Garcia was born in San Benito, Texas, in 1932. The identity of the midwife who delivered him is not known.

105. Mr. Garcia's mother died in childbirth with his younger sister, and his birth was not contemporaneously registered. His birth was later registered in Travis County, Texas, in 1969, and he was issued a delayed birth certificate, which was based on a baptismal certificate issued in San Benito that indicated his date of birth, a Selective Service Registration Card dated

June 10, 1964, and the personal testimony of Jesus Lugo, an acquaintance of Mr. Garcia's father. Mr. Garcia's older brothers were also born in Texas and issued delayed birth certificates.

106. Mr. Garcia was baptized in San Benito, Texas, on March 3, 1945, and, though he did not attend school, lived in Texas for most of his life before his 1952 marriage to a Mexican woman. His certificate of marriage was issued in Mexico and describes his wife as "Mexican" and Mr. Garcia as "Northamerican." *See* Exhibit H at 4-5.

107. In 1972, three of Mr. Garcia's children were granted Certificates of Citizenship by virtue of his U.S. citizenship. A fourth child received his Certificate of Citizenship in 2001. When his fifth child, Armando Garcia, filed for such a certificate, the adjudicating U.S. Citizenship and Immigration Services (USCIS) officer denied Armando's claim for derivative citizenship based on asserted skepticism as to whether Arturo Garcia's birth actually occurred in the United States. While Armando's case was under review before the U.S. Court of Appeals for the Fifth Circuit, and after a de novo review of the documentation supporting Arturo Garcia's claim to U.S. citizenship, an Administrative Appeals officer found that a "preponderance of the evidence" supported Arturo Garcia's claim. Accordingly, Armando Garcia also received his Certificate of Citizenship based on his father's U.S. citizenship. *See* Exhibit H at 8.

108. To date, however, Mr. Garcia has not been able to obtain a U.S. passport. Despite five Certificates of Citizenship having issued to his children on the basis of Mr. Garcia's citizenship, the Department asserted that he had insufficient proof of his claim to citizenship and required that he produce his mother's birth certificate, his elementary school records, or a census report substantiating his residency in the United States. The documents demanded either never

existed in Mr. Garcia's case or were not available to him for a number of reasons. He was consequently unable to comply with this aspect of the Department's demand.

109. On February 6, 2007, Mr. Garcia received a letter from the Department informing him that his application was filed without further action.

110. In this manner, the Department effectively denied Mr. Garcia's application for a passport. On information and belief, Mr. Garcia asserts that the Department's "closure" of his passport application was the product and function of the policy, pattern, and practice alleged herein.

111. Subsequent to the filing of this lawsuit, Mr. Garcia learned that the Department intends to grant his passport application. As of the date of this second amended complaint, however, Mr. Garcia had not yet received his passport.

**3. SOFIA ELIZABETH LOPEZ**

112. Sofia Elizabeth Lopez was born in 1989 in Brownsville, Texas. Her birth was attended by a midwife named Enriqueta Gonzalez, who signed the birth certificate three days later and filed it in Brownsville, Texas, the same day.

113. Enriqueta Gonzalez is identified on the "suspicious midwives list" as having been convicted, *see* Exhibit A at 2, but the evidence surrounding Sofia Elizabeth Lopez's birth demonstrates that her U.S. birth record is legitimate.

114. Bertha Lopez, who was also a witness to the birth of Sofia Elizabeth Lopez, has provided an affidavit explaining the circumstances of Sofia Elizabeth Lopez's birth in Brownsville, Texas.

115. Two days after her birth, Sofia Elizabeth Lopez was taken to Matamoros, Mexico, where her parents resided. She was baptized there on June 9, 1990. Her baptismal certificate confirms that she was born in Brownsville, Texas, on the date shown on the face of her U.S. birth certificate. *See* Exhibit B at 5-6. Because her family lived in Mexico, her mother registered her birth with the Mexican civil registry as having been born in Matamoros, Mexico, on May 3, 1990, in order to allow her to access Mexican health care, immunization services, and other social services.

116. At the age of six, Ms. Lopez began crossing the border daily to attend school in the United States. She eventually moved to Brownsville in May 2002.

117. Ms. Lopez applied for a U.S. passport on October 12, 2007.

118. By letter dated October 24, 2007, the Department requested the "long form" of her birth certificate, which she provided. *See id.* at 7.

119. Then, by letter dated December 5, 2007, the Department informed her that because she was not born in a "medical facility," her birth certificate was "not acceptable for passport purposes," and that she therefore needed to submit additional supporting documentation. *Id.* at 8.

120. By letter dated February 1, 2008, Ms. Lopez explained the circumstances of her birth and that the use of midwives was extremely common in Hispanic communities, both for their low-cost as well as for cultural and linguistic reasons. *See id.* at 10. She included a detailed list of the supporting documentation she could provide and noted why she was unable to provide certain forms of documentation. She sent what she was able to provide, including school records from when she began attending school at age six in the United States, immunization records, a

baptismal certificate, a notice of Enriqueta Gonzalez's death (to explain why she could not get additional evidence from her), and an affidavit from Bertha Lopez, the woman who had taken her mother to the midwife on the day she was born. *See id.* at 60. In addition, Sofia Elizabeth Lopez sent her mother's border crossing card to demonstrate her mother's physical presence in the United States. Because Ms. Lopez's family did not reside in the United States during her early childhood, she could not provide U.S. tax, rent, or employment letters for her parents. *See* Exhibits B. Ms. Gonzalez, the midwife who delivered Ms. Lopez, passed away on May 22, 2002; it was therefore impossible for Ms. Lopez to obtain any further documentation from her in support of Ms. Lopez's passport application. *See id.* at 61.

121. Ms. Lopez subsequently received a form letter from the Department, dated on or about February 21, 2008, stating as follows:

> Our office wrote to you on 12/08/2007, and requested further information and/or documentation in support of your passport application executed on 10/12/2007. We have not received a response from you, or you have not fully complied, with the request for additional information and/or documentation in the referenced correspondence. Therefore, your passport application is being filed without further action.

*Id.* at 1.

122. The letter of February 21, 2008, in effect denied Ms. Lopez's application for a passport. On information and belief, Ms. Lopez asserts that the Department's "closure" of her passport application was the product and function of the policy, pattern, and practice alleged herein.

**4. MIRIAM SUJEE GONZALEZ**

123. Miriam Sujee Gonzalez was born in Brownsville, Texas, in 1976. Her birth was attended by midwife Enriqueta Cavazos, whose name does not appear on the "suspicious

midwives list." *See* Exhibit A. Ms. Cavazos signed the birth certificate two days after Miriam was born and filed it the same day with the Brownsville Registrar.

124. Miriam currently resides in Houston, Texas. She attended primary school in Brownsville and most of middle and high school in Houston, Texas.

125. Miriam Gonzalez applied for a U.S. passport at the Passport Agency in Houston, Texas, in or about June 2007.

126. The Department responded by letter, dated November 6, 2007, and requested additional information to support her place and date of birth, specifically directing that she submit "a combination of early public documents created at the time of [her] birth." *See* Exhibit I at 7.

127. Miriam Gonzalez, now through counsel, responded to this demand on February 1, 2008, by sending a variety of documents by Federal Express. The documents were delivered on February 2, 2008. *See id.* at 5. In addition to a completed Supplemental Worksheet, this package included, among other documents, her birth certificate and her original baptismal certificate, indicating that she was baptized on February 13, 1977, in Mexico, but that her place of birth was Brownsville, Texas; Brownsville-based and Houston-based school records; and two Brownsville School District health records showing immunizations and other basic health information. *See id.* at 8-54.

128. By letter dated February 19, 2008, the Department informed Miriam Gonzalez that it had not received a response from her and that her application was therefore being "filed without further action." *See id.* at 1.

129. In response, by letter dated February 27, 2008, Miriam, through counsel, challenged the assertion that the documents had not been received by the Passport Office and sent a Federal Express airbill as proof that the documents had been delivered on February 2, 2008, within the 90-day timeframe the agency had allotted. She insisted that the agency locate the numerous original documents that she had sent at their direction and requested adjudication of her application. *See id.* at 2-4.

130. Miriam Gonzalez has not received any further substantive response from the Department or a meaningful individualized adjudication of her application, and the Department has not returned her original birth certificate.

131. The letter of February 19, 2008, in effect denied Ms. Gonzalez's application for a passport. On information and belief, Ms. Gonzalez asserts that the Department's "closure" of her passport application was the product and function of the policy, pattern, and practice alleged herein.

**5. JUAN LUIS FLORES**

132. Juan Luis Flores was born in Rio Hondo, Texas, in 1954, with the aid of a midwife named Justina Rios. Ms. Rios does not appear on the "suspicious midwives list." *See* Exhibit A. Ms. Rios signed the birth certificate and filed it with the Cameron County Registrar the day after Mr. Flores was born.

133. Mr. Flores lived in Rio Hondo, Texas, until he was 14 months old when his family, originally from Mexico, was deported. In 1967, Mr. Flores moved to Harlingen for a brief time and then moved to Houston in 1968. In or around 1981-1982, he moved back to

Harlingen, where he lived until 1994. Since that time, Mr. Flores has lived and worked on both sides of the border in that area (principally in Los Fresnos, Texas).

134. Although he never married the mother of his children, he filed numerous income tax returns while they were under the age of 18, in which he listed them as his children. Said returns were signed under oath. For purposes of 8 U.S.C. § 1409(a)(4)(B), he thereby legitimated his children, and on that basis, in 2001, one of Mr. Flores's daughters, Sandra Flores, obtained a Certificate of Citizenship through his U.S. citizenship. In 1975, Mr. Flores's father, Emilio Flores, also immigrated on the basis of his son, Juan Luis Flores, being a U.S. citizen. Emilio Flores is now a naturalized U.S. citizen and has been issued a U.S. passport.

135. In November 2007, Juan Luis Flores applied for a U.S. passport.

136. By letter dated January 10, 2008, the Department's Passport Agency in Charleston, South Carolina, directed that he complete a Supplemental Worksheet detailing his biographical data and provide additional evidence to support his claim of birth in the United States by sending "a combination of early public records created prior to or at the time of [his] birth" within 30 days. *See* Exhibit C at 15.

137. On February 8, 2008, Mr. Flores, through counsel, sent a letter to the Department explaining that Mr. Flores was attempting to comply with its demands and that he needed an additional 30 days to gather supporting documentation. *See id.* at 14.

138. On March 3, 2008, Mr. Flores sent the Department the completed Supplemental Worksheet and supporting documents, including the baptismal certificate for his sister, Maria de la Luz Flores Hernandez, showing that she was baptized in Rio Hondo, Texas, on December 12, 1953, and, in turn evidencing his family's physical presence in the United States months prior to

Mr. Flores's birth. *See id.* at 3. Mr. Flores also sent his own original baptismal certificate, showing that he had been baptized in Matamoros, Mexico, on September 2, 1955, and indicating that he had been born in Rio Hondo, Texas, on the date indicated in his original birth certificate. Finally, Mr. Flores sent a declaration by his father that explains the circumstances of his birth and why the family moved from Brownsville to Matamoros. *See id.* at 9.

139. The Department responded by returning his documentation with a form letter, dated March 26, 2008, stating as follows:

> Our office wrote to you and requested further information and/or documentation in support of your passport application. We have not received a response from you, **or** you have not fully complied, with the request for additional information and/or documentation in the referenced correspondence. Therefore, your passport application is being filed without further action.

*Id.* at 1.

140. The letter of March 26, 2008, effectively denied Mr. Flores's application for a passport. On information and belief, Mr. Flores asserts that the Department's "closure" of his passport application was the product and function of the policy, pattern, and practice alleged herein. *See id.*

**6. ROCIO FLORES**

141. Rocio Flores is the older daughter of Juan Luis Flores. She was born in 1978 in Matamoros, Mexico.

142. Like her younger sister, Rocio Flores was legitimated by her father when, prior to her eighteenth birthday, he filed tax returns, stating under oath that she was his daughter.

143. Also like her sister, Sandra, Rocio Flores claims to have acquired U.S. citizenship through her father. Sandra Flores applied for a Certificate of Citizenship on May 24, 1999, and

was recognized as a U.S. citizen on March 22, 2001, on the basis of her father's U.S. citizenship. Rocio Flores also applied for a Certificate of Citizenship, but with the aid of an accredited representative rather than an attorney. That application was denied on the erroneous ground that she had not been "legitimated" within the meaning of 8 U.S.C. § 1409. The representative did not appeal the denial.

144. On November 27, 2007, together with her father and sister, Rocio Flores filed an application for a U.S. passport. The application of Rocio's sister, Sandra Flores, was approved, and she was issued a U.S. passport.

145. The Department, through its Charleston Passport Agency, responded to Rocio Flores, however, in a letter dated January 10, 2008, demanding additional documentation – preferably a USCIS-issued Certificate of Citizenship or a Consular Report of her birth. *See* Exhibit D at 3. If she could not provide those documents, the letter indicated that she could alternatively submit an "Affidavit of Parentage of Physical Presence" to be filled out by her father on a form supplied by the Passport Office that would require him to detail his physical presence and residence in the United States and abroad prior to Rocio's birth. *See id.* In addition, the letter instructed her to send public documents that "must account for ten (10) years of physical presence in the United States, at least five (5) of which are after his/her fourteenth birthday." The letter stated that she would be given 30 days to produce this evidence. *See id.*

146. Ms. Flores complied. On February 8, 2008, through retained counsel, she sent a letter to the Department with an affidavit from her father, Juan Luis Flores, attesting to his physical presence. *See id.* at 6. She also explained that she was attempting to comply with their

request for supporting documents and needed an additional 30 days to gather this additional evidence. *See id.*

147. On March 3, 2008, Rocio Flores sent the Department another letter stating that she did not have additional documentation to support her father's affidavit and requesting an adjudication based on the ample documentation of her father's citizenship previously provided. *See id.* at 2.

148. The Department responded by form letter (identical to that sent to her father), dated March 26, 2008, indicating that her documents were being returned to her and that her application was "being filed without further action." *Id.* at 1.

149. The letter of March 26, 2008, in effect denied Ms. Flores's application for a passport. On information and belief, Ms. Flores asserts that the Department's "closure" of her passport application was the product and function of the policy, pattern, and practice alleged herein.

**7. J.S. (minor)**

150. J.S. was born in 1994 at the San Juan Maternity Center in San Juan, Texas. His birth was registered with the Hidalgo County Registrar 13 days after he was born.

151. J.S.'s birth was attended by a midwife named Rita V. Colunga. Ms. Colunga appears on the "suspicious midwives list," but is not identified as having been convicted. *See* Exhibit A at 1.

152. Shortly after he was born, J.S.'s parents, both Mexican citizens who resided in Mexico at the time of his birth, returned to Mexico, taking him with them.

153. J.S., through his mother, applied for a U.S. passport on January 3, 2008. He presented his "long form" Texas birth certificate, which was signed the day of his birth and filed with the local registrar shortly thereafter.

154. In response to his application, the Department sent a letter, dated January 14, 2008, directing him to complete a biographical Supplemental Worksheet and submit "a combination of early public documents created at the time of [his] birth" and evidence of his mother's residency in the United States at the time of his birth. *See* Exhibit J at 1.

155. Attempting to comply with this request, the applicant submitted J.S.'s Mexican baptismal certificate, dated July 5, 1998, which shows the date of birth reflected in his original birth certificate, and his Mexican school records from 2005 through 2007. He also submitted a birth certificate and "Statistical Records" (complete with his footprint and his mother's fingerprint), both of which were issued by the San Juan Maternity Clinic, in San Juan, Texas. *See id.* at 29.

156. Because his mother did not live in the United States at the time of his birth, he could not provide proof that his mother was "residing" there at the time of his birth. He did, however, send his mother's Mexican passport as proof of her place of residency. In the affidavit subsequently provided to the Department (in the applicant's second submission of evidence, dated March 31, 2008), J.S.'s mother explained that she was not then and is not now "residing" in the United States. *See id.* at 11. She explained that she was present in the United States at the time of J.S.'s birth after crossing into the country with a local crossing card. She further explained that she no longer has this card but now has a current laser visa and the number of her prior document. *See id.*

157. On February 21, 2008, the Department sent a second request for additional evidence, this time explaining that the midwife who delivered him had been "suspected of filing questionable U.S. birth certificates" and specifically requiring that, within 45 days, he send prenatal and postnatal records and immunization records "created during his infancy." *Id.* at 23.

158. J.S. responded on or about March 31, 2008, by sending a letter requesting additional time to locate the requested prenatal and postnatal records and enclosing his brother's prenatal records as proof of the legitimacy of the birth facility. *See id.* at 11, 12. In addition, the applicant submitted the requested records from immunizations during J.S.'s infancy, which were administered between 1994 and 2003 in Mexico, where he and his family resided at that time. *See id.* at 13-16. J.S. sent an affidavit from his mother to the Department, explaining that access to public medical care (namely, immunizations) was the reason why she registered J.S. with the Mexican civil registry. *See id.* at 12. In addition, J.S. sent the Department the Mexican birth registration, which shows his correct date of birth, but was not registered until more than three weeks after J.S. was born. *See id.* at 25.

159. By letter dated April 24, 2008, the Department informed J.S. that it was closing his application "without further action," for failure to provide proof of his "mother's residence in the United States at the time of [his] birth." *Id.* at 24. The Department returned most of his documents, but not his original, long-form Texas birth certificate.

160. The letter of April 24, 2008, in effect denied J.S.'s application for a passport. On information and belief, J.S. asserts that the Department's "closure" of his passport application was the product and function of the policy, pattern, and practice alleged herein.

**8. DAVID HERNANDEZ**

161. David Hernandez was born in 1964 in San Benito, Texas.

162. A few months prior to his birth, Mr. Hernandez's mother, a citizen of Mexico and now a lawful permanent resident of the United States, entered the United States with a border crossing card. At the time of Mr. Hernandez's birth, his mother was staying in San Benito, Texas. *See* Exhibit E.

163. Mr. Hernandez's birth was attended by a midwife named Albina Pedraza. While spending the weekend at the home of nearby friends, Victoria and Carlos Barrientos, David's mother unexpectedly went into labor. *See id.* at 19. At Victoria Barrientos' suggestion, she enlisted the aid of Ms. Pedraza, a midwife whom her friend had used to assist in the delivery of her own children. *See id.* Albina Pedraza is on the "suspicious midwives list," but she is not identified as having been convicted. *See* Exhibit A at 2.

164. Mr. Hernandez's birth was timely registered with the local registrar eight days after he was born. *See* Exhibit E.

165. Mr. Hernandez's mother returned to Mexico, taking Mr. Hernandez with her, when he was nine days old to be with his maternal grandmother. Mr. Hernandez spent most of his infancy in Mexico, returning briefly to Texas when he was baptized in San Benito. *See id.* at 8-9.

166. In September 1967, after Hurricane Beulah, Mr. Hernandez and his mother moved back to the Rio Grande Valley, where he lived and attended school. *See id.* at 9.

167. Mr. Hernandez has also served honorably in the United States Army, where he received various ribbons and medals. *See id.*

168. Mr. Hernandez applied for a U.S. passport in 2007.

169. In a letter dated August 31, 2007, the Department notified Mr. Hernandez that the birth document he provided, in its view, did not support his claim of U.S. birth and directed that he substantiate his claim by completing a Supplemental Worksheet and sending a combination of contemporaneously-created documents that would evidence his place of birth or his parents' residency in the United States at the time of his birth. *See id.* at 3. In a letter dated October 22, 2007, the Department also directed that Mr. Hernandez provide "a combination of early public documents created prior to or at the time of [his] birth" within 45 days. *See id.* at 2.

170. In response, Mr. Hernandez provided a variety of documents to evidence his birth in the United States, including his baptismal certificate, which indicates that he was baptized in San Benito, Texas, on July 3, 1966, and that he was born in San Benito on the date reflected in his original birth certificate, and his Texas Department of Health immunization records, issued by the Harlingen Health Center, which show immunizations administered from 1970 through 1974. *See id.* at 5, 13. He also provided school records from 1979 to evidence his having attended school in the Harlingen School District. *See id.* at 16-17. As an explanation of why he could not provide his school records from earlier years, he sent a letter from the Custodian of Records for the Harlingen Public School District stating that Mr. Hernandez's elementary school records are no longer available. *See id.* at 15. In an effort to forestall any assertion of Mexican birth, Mr. Hernandez requested a search of Mexican birth records for a record of himself and provided the Department with the resulting letter from the Mexican Civil Registry which indicated that no such person existed in their records. *See id.* at 6-7. To explain further the circumstances of his birth, he submitted affidavits from his mother, *see id.* at 8-9, and from

Abundio Barrientos Rios, the daughter of Victoria Barrientos, who was present when David's mother went into labor, *see id.* at 19. He further attempted to prove the legitimacy of his midwife-assisted birth by sending an open records request to the Texas Midwifery Board, in which he requested the licensure file for Alvina M. Pedraza. The Midwifery Board responded by letter, indicating that no records prior to 1983 were available and that no such file was found in searches of post-1983 records. *See id.* at 12. Mr. Hernandez also sent this letter to the Department. In addition, he sent the Department his certificate of discharge from the Army, which shows that he served from 1986 through 1989. *See id.* at 18.

171. The Department responded by letter, dated April 8, 2008, asserting that it had "not received a response from [him], or [he had] not fully complied with the request for additional information and/or documentation," and informing Mr. Hernandez that his passport application was therefore being "filed without further action." *See* Exhibit E at 1. With the letter, the Department returned the numerous documents Mr. Hernandez had submitted.

172. The letter of April 8, 2008, in effect denied Mr. Hernandez's application for a passport. On information and belief, Mr. Hernandez asserts that the Department's "closure" of his passport applications was the product and function of the policy, pattern, and practice alleged herein.

**9. JUAN ARANDA**

173. Juan Aranda was born in Weslaco, Texas, in 1970, with the aid of a midwife named Manuela Bazan. Ms. Bazan does not appear on the "suspicious midwives list." *See* Exhibit A. Ms. Bazan signed Mr. Aranda's birth certificate and filed it with the Hidalgo County

registrar two days after his birth. Mr. Aranda was baptized at St. Joan of Arc Roman Catholic Church in Weslaco on April 26, 1970.

174. Mr. Aranda has lived in the United States his entire life. His mother, Cupertina Espinoza, is originally from Mexico. She moved to South Texas the year before Mr. Aranda was born to work as a live-in housekeeper for a family that owned a flower shop called La Perla, which still exists on the main street of Weslaco. For the last 13 years, Mr. Aranda has worked as a supervisor for a U.S. company that filters and sells drinking water in Mexico.

175. Mr. Aranda applied for a passport on May 23, 2007. With his application, he submitted his birth certificate, and two photographs of himself. On September 7, 2007, the Department's Passport Agency in Portsmouth, New Hampshire, sent Mr. Aranda a letter directing him to complete a Supplemental Worksheet that asked for detailed biographical data. *See* Exhibit F at 5. The Department also instructed him to submit additional evidence to support his claim of birth in the United States by sending "a combination of early public records created prior to or at the time of [his] birth" within 30 days. *See id.* at 5-10.

176. Mr. Aranda was on a business trip when the letter arrived at his home. By the time he returned, there was insufficient time remaining to respond to the Department's letter. When Mr. Aranda subsequently called the Department to check on the status of his application, he was informed that it had been closed. His documents and photographs were not returned to him.

177. On November 18, 2007, Mr. Aranda applied a second time for a passport. With this application, he re-submitted the same documents he had attached to his first application. To

obtain those same documents he had to go to his local city hall, pay a fee, and request a duplicate original birth certificate. He also had new photos taken to attach to his second application.

178. On December 18, 2007, the Department's Passport Agency in Portsmouth, New Hampshire, sent Mr. Aranda a letter stating that "further information is needed to support your claim of birth in the U.S." *See id.* at 26. It directed him to "submit a combination of early public records created prior to or at the time of your birth" and listed as examples of such documents his mother's prenatal medical records in the U.S., a newspaper announcement of his birth in the U.S., and his parents' U.S. school records. *See id.* at 26-27. It also demanded that he complete a Supplemental Worksheet that asked for biographical details. This time, the Department gave Mr. Aranda 45 days to respond, and stated that his application would be denied unless he "adequately address[ed] the requirements above for issuance of a passport." *Id.* at 26.

179. Mr. Aranda submitted his response to the Department's letter on January 23, 2008, well within the 45-day period the Department told him he had. *See id.* at 28-29. His response included a completed Supplemental Worksheet, a certified copy of his baptismal certificate, and his official elementary and junior high school records from the Weslaco Independent School District. *See id.* at 30-41. Additionally, Mr. Aranda submitted his own letter in which he itemized the list of other documents that the Department had provided as examples of what would satisfy its demand for supplemental proof of his U.S. citizenship and explained that he was unable to secure those documents because they did not exist. He stated, for example, that he could not obtain records of his mother's prenatal medical care or medical care at the time of his birth because she did not receive such care from a doctor or hospital. He explained that he had been delivered by a midwife and that he had been unable to locate her or

any of her family members. In his Supplemental Worksheet, he elaborated that his mother "did not have the resources for [prenatal and postnatal medical care]." *Id.* at 28. Explaining why he could not provide a newspaper birth announcement, he wrote in his letter that an announcement of his birth was "not put in the newspaper." *Id.* at 28-29.

180. Despite his timely response to the Department's December 18 letter, Mr. Aranda received a letter from the Department's Portsmouth, New Hampshire Passport Agency on February 1, 2008, stating that it has not "received a response from you, or you have not fully complied, with the request for additional information and/or documentation in the referenced correspondence. Therefore, your passport application is being filed without further action." *See id.* at 21.

181. In February 2008, Mr. Aranda sent a letter to the Department's Portsmouth, New Hampshire Passport Agency stating that he had "respond[ed] to your questions within the 45 days you gave me." *Id.* at 22. He further explained that he had enclosed a letter "addressing every question you had on your cover letter" and that he had complied with the other demands in the Department's letter. *Id.* He concluded his letter stating "I was born and raised in the United States. I attended and graduated from school in the United States. So why is my citizenship being questioned. I respectfully would like to request the reason for the denial of my application for passport." *Id.*

182. On February 28, 2008, the Department sent Mr. Aranda a one-sentence letter and returned to Mr. Aranda the documents he had submitted with his second application. *See id.* at 23.

183. In March, 2008, Mr. Aranda visited Congressman Juan Hinojosa's local office in McAllen, Texas. He later communicated via email with Rosie Cavazos, a member of Congressman Hinojosa's staff, on April 3, 2008, about whether she had been able to contact anyone in reference to his application for a passport. That same day, Ms. Cavazos responded to Mr. Aranda that the Department had found that his application was "not sufficient to satisfy the agency," and that Congressman Hinojosa's office would "also be submitting a formal written request." Mr. Aranda has not heard of any further developments regarding his application. *See id.* at 46-47.

184. Mr. Aranda traveled to Harlingen on June 19, 2008, to speak to an immigration officer about his application. He showed the officer he met with the Department's February 1 letter and asked what he could do. The officer recommended that he tell Channel 5 news about what happened to him and stated that it appeared to her based on the documents that he is indeed a U.S. citizen. Mr. Aranda asked if the immigration officer would put this in writing, and the officer responded that she could not do that.

185. The Department's February 1, 2008 letter, in effect denied Mr. Aranda's application for a passport. On information and belief, Mr. Aranda asserts that the Department's "closure" of his passport applications was the product and function of the policy, pattern, and practice alleged herein.

## IV. CLASS ALLEGATIONS

186. The cases described above are not isolated instances, but rather a small sampling of the hundreds of cases of people similarly situated to Plaintiffs. Their cases reflect and are the product of the herein-described nationwide discriminatory policy, pattern, and practice.

187. Plaintiffs herein seek to represent a nationwide class, consisting of all persons (a) who are Mexican-Americans and/or have Latino surnames, (b) whose births in Southwestern border states were attended by midwives or whose citizenship is claimed through a parent whose birth in a Southwestern border state was attended by a midwife, and (c) who have filed or will file applications for U.S. passports, in whose cases, on or after April 8, 2003, Defendants did, or will, classify as "filed without further action," treat as abandoned, or otherwise close their applications.

188. On information and belief, Plaintiffs allege that the class as so defined numbers at least in the hundreds.

189. The class is so numerous that joinder of all members would be impracticable.

190. The claims of the Plaintiffs are typical of the claims of the class.

191. The Plaintiffs, and their counsel, can and will fairly and adequately protect the interests of the proposed class. Class counsel are experienced in class action litigation and civil rights litigation of the type involved here.

192. There are questions of law and fact that are common to the class that predominate over any individual questions. Further, Defendants have acted, or refused to act, on grounds generally applicable to the class, making appropriate final injunctive, mandamus, and declaratory relief with respect to the class as a whole.

## V. DECLARATORY AND INJUNCTIVE RELIEF ALLEGATIONS

193. An actual and substantial controversy exists between Plaintiffs and Defendants as to their respective legal rights and duties. Plaintiffs contend that Defendants' actions violate Plaintiffs' rights and the rights of proposed class members, including their clear right to have

their passport applications acted upon in an individualized, fair, and nondiscriminatory manner. On information and belief, Defendants contend that their actions do not violate the rights of Plaintiffs and the proposed class members.

194. Defendants' failure to provide individualized adjudications on the merits to passport applicants categorically deemed "suspicious" because of their perceived Mexican ancestry and midwife-assisted births, and their failure to issue passports despite these applicants' compliance to the extent possible with their arbitrary and burdensome demands for evidence has caused, and will continue to cause, irreparable injury to Plaintiffs and members of the proposed class. Plaintiffs and proposed class members have no plain, speedy, and adequate remedy at law.

195. Based on the foregoing, the Court should grant declaratory and injunctive relief under 28 U.S.C. §§ 1361, 2201, and 2202, 5 U.S.C. §§ 701-702, and 8 U.S.C. § 1503.

## VI. CAUSES OF ACTION

### A. CLASS-WIDE DECLARATORY JUDGMENTS AND CORRESPONDING INJUNCTIVE RELIEF (Violation of Due Process under the U.S. Const. Amend. V)

196. Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

197. Defendants' policy, pattern, and practice of treating Plaintiffs and proposed class members as categorically suspicious, subjecting them to burdensome and excessive demands for additional evidence, imposing a heightened burden of proof, and then closing or filing away their fee-paid passport applications, instead of adjudicating them on their individual merits, violates the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

198. Furthermore, to the extent that applicable regulations afford the Department unfettered discretion and a mechanism for implementing the policy, pattern, and practice complained of herein, such regulations violate the Due Process Clause to the Fifth Amendment of the U.S. Constitution.

**B. CLASS-WIDE DECLARATORY JUDGMENTS AND CORRESPONDING INJUNCTIVE RELIEF (Violation of Equal Protection under the U.S. Const. Amend. V)**

199. Plaintiffs herby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

200. On information and belief, Defendants have improperly applied a higher level of scrutiny and imposed additional burdens on Plaintiffs' and proposed class members' passport applications and further classified them as "filed without further action" or otherwise abandoned because they are citizens of Mexican descent or have Latino surnames and their births in Southwestern border states were assisted by midwives.

**201.** Defendants' decision to take Plaintiffs' and proposed class members' race, ancestry, and ethnicity into account, and base decisions on the same, when processing their passport applications is unconstitutional and violates their Fifth Amendment-protected right to equal protection.

**C. CLASS-WIDE DECLARATORY JUDGMENTS AND CORRESPONDING INJUNCTIVE RELIEF (Violation of Administrative Procedure Act)**

202. Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

203. Defendants' "filing without further action" and effective denial of Plaintiffs' applications for U.S. passports constitutes final, adverse agency actions under the Administrative Procedure Act ("APA").

204. Said denials and the processes by which they were reached are arbitrary, capricious, and contrary to law, within the meaning of the APA. *See* 5 U.S.C. § 703.

205. Alternatively, Defendants' "filing without further action" or effective denial of Plaintiffs' applications for U.S. passports constitutes a failure to act that forms the basis for a reviewing court to compel agency action unlawfully withheld or unreasonably delayed. *See* 5 U.S.C. § 701.

**D. WRIT OF MANDAMUS**

206. Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

207. On behalf of the class they seek to represent, Plaintiffs seek a Writ of Mandamus, mandating that Defendants actually and individually adjudicate under the proper standard the passport applications of Plaintiffs and all proposed class members, rather than closing or filing the applications "without further action."

208. Defendants have a ministerial, nondiscretionary duty to Plaintiffs and members of the proposed class to adjudicate their passport applications on their individual merits.

209. Defendants' failure to do so, and instead to create and maintain the policy, pattern, and practice described herein, is tantamount to denying Plaintiffs and proposed class members their constitutionally and statutorily protected rights and privileges.

210. Plaintiffs and proposed class members have no adequate remedy at law for the failure of Defendants to adjudicate their applications on their individual merits and under the proper standards.

211. The Court should grant relief in the form of a Writ of Mandamus compelling Defendants to adjudicate on the individual merits and under the proper standard the applications of Plaintiffs and proposed class members.

### E. DECLARATORY JUDGMENT INDIVIDUAL ACTIONS

212. Plaintiffs hereby incorporate by reference all allegations of the preceding paragraphs as if fully set forth herein.

213. Plaintiffs have been denied rights and privileges claimed as citizens and nationals of the United States, within the meaning of 8 U.S.C. § 1503, by virtue of the denial of their applications for a U.S. passport and consequent inability to travel freely. Therefore, the named Plaintiffs are entitled to bring a declaratory judgment action under 8 U.S.C. § 1503, seeking a declaration that they are, indeed, U.S. citizens.

## VII. PRAYER FOR RELIEF

WHEREFORE, it is respectfully requested that in view of the above, this Honorable Court grant the following relief:

(1) Assume jurisdiction over the matter;

(2) Certify this case as a class action as soon as is practicable;

(3) Declare that Defendants' policy, pattern, and practice of treating Plaintiffs and class members as categorically suspicious; subjecting them to arbitrary, burdensome, and excessive demands for additional evidence; imposing a heightened burden of proof; and then closing or filing away their fee-paid passport applications, instead of adjudicating

them on their individual merits, violates due process, equal protection, the Administrative Procedure Act, and other applicable law;

(4) Grant the requested writs, and set aside the effective denial of Plaintiffs' and class members' applications for United States Passports;

(5) Issue a Writ of Mandamus and such other injunctive relief as may be appropriate, mandating that Defendants adjudicate the passport applications of Plaintiffs and all class members on an individualized nondiscriminatory basis in a manner consistent with the applicable burden of proof;

(6) Further declare that Plaintiffs are U.S. citizens and permanently restrain and enjoin Defendants from withholding the requested passports;

(7) Award reasonable attorney fees and costs pursuant to the Equal Access to Justice Act and such other law as may be applicable; and

(8) Grant such other and further relief as the Court may consider appropriate.

Respectfully submitted,

s/ Lisa S. Brodyaga, Federal Id: 1178, Texas State Bar: 03052800
Attorney at Law
Refugio del Rio Grande, Inc.
17891 Landrum Park Road
San Benito, TX 78586
(956) 421-3226
(956) 421-3423 (fax)
Attorney-In-Charge

Robin L. Goldfaden*
American Civil Liberties Union Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0776
(415) 395-0950 (fax)

Vanita Gupta*
American Civil Liberties Union Foundation
Racial Justice Program

125 Broad Street
New York, NY 10004
(212) 549-2607
(212) 549-2651 (fax)

Lisa Graybill, Texas State Bar: 24054454
American Civil Liberties Union Foundation of Texas
P.O. Box 12905
Austin, TX 78711
(512) 478-7300
(512) 478-7303 (fax)

Adam K. Levin*
Melissa N. Henke*
David J. Weiner*
Robert B. Wolinsky*
Hogan & Hartson LLP
555 13th Street, NW
Washington, DC 20004
(202) 637-5600
(202) 637-5910 (fax)

*Applications for *pro hac vice* admission forthcoming.